Certiorari granted, June 24, 2013
Vacated by Supreme Court, June 24, 2013

**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

　　　　　*Plaintiff-Appellee,*

v.

MANTEL DELANCE MUBDI,

　　　　　*Defendant-Appellant.*

No. 10-5008

Appeal from the United States District Court
for the Western District of North Carolina, at Statesville.
Richard L. Voorhees, District Judge.
(5:08-cr-00051-RLV-DCK-1)

Argued: January 24, 2012

Decided: August 10, 2012

Before SHEDD, DAVIS, and DIAZ, Circuit Judges.

---

Affirmed by published opinion. Judge Diaz wrote the opinion, in which Judge Shedd joined. Judge Davis wrote a separate opinion concurring in part and in the judgment.

---

## COUNSEL

**ARGUED:** Matthew Segal, Assistant Federal Defender, FEDERAL DEFENDERS OF WESTERN NORTH CARO-LINA, INC., Asheville, North Carolina, for Appellant. Amy Elizabeth Ray, Assistant United States Attorney, OFFICE OF

THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee. **ON BRIEF:** Claire J. Rauscher, Executive Director, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Kevin A. Tate, Assistant Federal Defender, Charlotte, North Carolina, for Appellant. Anne M. Tompkins, United States Attorney, Melissa L. Rikard, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

---

**OPINION**

DIAZ, Circuit Judge:

Mantel Delance Mubdi entered a conditional guilty plea to drug and firearms offenses, reserving the right to challenge the district court's denial of his motion to suppress evidence seized during a traffic stop. The district court sentenced him to 300 months' imprisonment. On appeal, Mubdi contends that the district court erred in denying his motion to suppress because the officers who stopped his car did not have probable cause to execute the stop. As an alternative ground for suppression, he contends that the officers unlawfully prolonged the traffic stop to conduct an open-air canine sniff of his car. Mubdi also argues that the district court erred in increasing his statutory mandatory minimum sentence for the drug offenses based on improper judicial factfinding. Finding no error, we affirm.

I.

A.

On the morning of September 30, 2008, Mubdi was driving a gray Dodge Magnum northbound on Interstate 77 near Statesville, North Carolina. In the car with Mubdi was

Markus Parham. Two Statesville Police Department Officers, Jason York and Phillip Wolfe, were parked in marked police cruisers perpendicular to the highway about ten yards from the right-hand side of the northbound lanes near exit 50.[1] As Mubdi approached the officers, they each visually determined that he was driving above the posted speed limit of fifty-five miles per hour.

York observed a group of cars in front of Mubdi's car traveling the speed limit, and he noticed that Mubdi was closing in on the group. He tracked Mubdi's car for about a hundred yards to estimate its speed at sixty-three or sixty-four miles per hour. Wolfe likewise noticed Mubdi's car gaining on the cars in front of it and pulling away from the cars behind it; he estimated Mubdi's speed at sixty-five miles per hour. Because of the angle at which the officers were parked, they were unable to verify their estimates with radar equipment. However, York and Wolfe had both passed a radar certification class that, among other things, provided training on how to visually estimate the speed of vehicles within a narrow margin of error.

The radar certification course constitutes a minimum of thirty-two hours of training, which includes sixteen hours of "supervised field practice where [officers] learn how to estimate the speed of vehicles and how to operate the radar units properly and to check off and set up the instrument and test for accuracy." J.A. 106. Estimating speed is a mandatory part of the certification process. Officers are trained to estimate speeds both from a stationary position and while in motion. An officer may err on any given estimate (or, indeed, all of them) and still receive certification, provided that he errs in the aggregate no more than forty-two miles per hour over

---

[1]York, a nine-year veteran of the Statesville Police Department, is a canine officer in the Department's criminal interdiction unit. Wolfe, a ten-year veteran of the Department, also works in the criminal interdiction unit.

twelve separate speed estimates (an average margin of error of three and a half miles).

York and Wolfe pursued Mubdi for a few miles as he merged from Interstate 77 onto Interstate 40 heading west.[2] Wolfe passed Mubdi's car in the left lane in an attempt to see whether its occupants were wearing seatbelts. Mubdi then merged behind Wolfe to pass a truck in the right lane. York, trailing Wolfe and Mubdi, determined that Mubdi was following Wolfe's patrol car at a distance of no more than two to three car lengths, contrary to the North Carolina Highway Patrol's recommendation that motorists keep at least a one car length interval per ten miles per hour of speed.[3]

At that point, York activated his blue lights to initiate a traffic stop. After what struck York as "an extended amount of time," *id.* 163, Mubdi pulled over to the side of the road. York approached the car and asked for Mubdi's driver's license and registration. He observed that Mubdi kept his foot on the brake pedal, instead of shifting the transmission to park and releasing the brake. Mubdi handed York a plastic pouch containing his license and a vehicle rental contract. York saw that Mubdi's "hands were shaking more so than an average person would be shaking for just a routine traffic stop" and

---

[2]The district court viewed a video recording of the events as captured by York's dashboard camera.

[3]The North Carolina statute proscribing motorists from following too closely mandates that a "driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway." N.C. Gen. Stat. § 20-152. Notably, the statute is silent as to what constitutes a "reasonable and prudent" distance. York testified that such a distance should be measured either by the Highway Patrol's recommendation or by the "two second rule" set out in the handbook of the Division of Motor Vehicles for North Carolina drivers. The rule prescribes that a driver "should allow two seconds between the time the vehicle ahead of [the driver] passes a given point and the time [the driver's] vehicle reaches that same point." J.A. 160. According to York, Mubdi did not comply with either standard.

that Mubdi looked scared. *Id.* 165-66. York asked Mubdi whether he had rented the car, and Mubdi said that he had. In response to York's questions regarding the purpose of Mubdi's travel, Mubdi said he was headed to his grandfather's funeral in Statesville and to his aunt's house. Mubdi, however, could not tell York his aunt's name or where she lived.

York returned to his patrol car to review Mubdi's license, insurance, and rental contract, and to issue Mubdi a warning ticket for speeding and following too closely. The rental contract showed that the car had in fact been rented to Latonyia Brathwaite, other drivers were explicitly forbidden from driving it, and the car was not permitted to travel outside of Georgia. All told, it took York approximately fifteen minutes to review Mubdi's paperwork and to issue the warning ticket, a time frame he described as typical. In the interim, Wolfe, along with his drug-sniffing canine, arrived on the scene.

After York completed the warning ticket for speeding and following too closely, he approached Mubdi's car to issue the citation. He asked Mubdi to roll up the windows, turn off the engine, and step out of the car. Mubdi complied but did not shift the transmission into park. As a result, the car began rolling away before Parham, still seated in the passenger seat, stopped it. York explained the warning ticket and then told Mubdi that Wolfe's dog would conduct an open-air sniff around the car.

Captain Jacob Dyson, who arrived on the scene for backup, approached the passenger's side of the car, knocked on the window, and asked Parham to get out. Parham just looked at him, so Dyson tried the door handle. Parham then rolled down his window, and, when Dyson again asked him to get out of the car, Parham responded, "What for? I don't have a gun." *Id.* 113. When Parham started to reach between his legs to the floorboard, Dyson feared that he was reaching for a firearm and unsnapped his holster. Parham, however, got out of the

car without incident, and both he and Mubdi consented to a pat-down for weapons. Shortly thereafter, Wolfe's dog conducted the open-air sniff and alerted. A search of the car uncovered crack and powder cocaine, as well as two loaded firearms, one under each front seat.

### B.

A grand jury returned a superseding indictment charging Mubdi with conspiracy to distribute and to possess with intent to distribute a quantity of cocaine and at least fifty grams of cocaine base, in violation of 21 U.S.C. § 846, possession with intent to distribute a quantity of cocaine and at least fifty grams of cocaine base, in violation of 21 U.S.C. § 841(a), (b)(1)(A), (b)(1)(C), possession of firearms in furtherance of drug trafficking crimes, in violation of 18 U.S.C. § 924(c), and possession of firearms by a convicted felon, in violation of 18 U.S.C. § 922(g)(1) and 18 U.S.C. § 924(e).

Mubdi moved to suppress the drugs and firearms on the grounds that the officers lacked probable cause to make a traffic stop, lacked reasonable suspicion to prolong the stop to conduct the canine open-air sniff, and conducted an illegal warrantless search of the car.[4] The district court denied Mubdi's motion. First, the court found that the officers had probable cause to make the traffic stop because Mubdi was speeding and following too closely. As to the first ground, the court concluded that York and Wolfe were trained in visually estimating vehicle speed and that their testimony regarding Mubdi's rate of speed was credible. After crediting the officers' testimony and reviewing the video recording of Mubdi changing lanes, the district court further found that the officers had probable cause to stop Mubdi for following too closely.

---

[4]Mubdi does not press this third ground on appeal.

The court also determined that the duration of the stop was reasonable, particularly given the objective facts that piqued the officers' growing suspicions. Finally, the court found that the ensuing search of the car was proper on two independent grounds: (1) Mubdi and Parham did not have a reasonable expectation of privacy in the car in that neither of them was an authorized driver on the rental contract, and (2) the officers were justified in searching the car based on the canine alert and Mubdi's and Parham's behavior.[5]

Mubdi entered a conditional guilty plea to all charges, reserving the right to appeal the denial of his suppression motion. At the sentencing hearing, the district court adopted the Presentence Investigation Report setting Mubdi's offense level at thirty and his criminal history category at IV. Mubdi's Guidelines sentence was 240 months on the drug charges, due to the government's filing of a notice of its intent to seek an enhanced punishment under 21 U.S.C. § 851. The district court imposed this sentence and a term of 120 months on the possession of a firearm by a felon charge, to run concurrently. Additionally, the district court imposed a mandatory consecutive sixty-month sentence on the § 924(c) charge, yielding a total term of 300 months' incarceration. Mubdi timely appealed.

---

[5]Mubdi challenges both grounds on appeal. With respect to his purported privacy interest as a driver of the rental car, he argues that his case is distinguishable from *United States v. Wellons*, 32 F.3d 117, 119 (4th Cir. 1994), in which we held that an unauthorized driver of a rental car lacks a reasonable expectation of privacy in the car, notwithstanding that he may have the authorized driver's permission. In *Wellons*, the evidence sought to be suppressed was the fruit of an unlawful search. *Id.* Mubdi contends, however, that the evidence he seeks to suppress is the fruit of an unreasonably long *seizure*. Mubdi presses that, to the extent that *Wellons* controls this case, we should revisit its holding and reach a contrary conclusion. Because we agree with the district court that the canine alert and Mubdi's and Parham's behavior alone justified the search, we need not address this separate argument.

II.

In considering the district court's denial of a motion to suppress, we "review the district court's legal determinations de novo and its factual determinations for clear error." *United States v. Kelly*, 592 F.3d 586, 589 (4th Cir. 2010). When the district court has denied a suppression motion, we must "construe the evidence in the light most favorable to the government." *Id.* We are also to "particularly defer to a district court's credibility determinations, for it is the role of the district court to observe witnesses and weigh their credibility during a pre-trial motion to suppress." *United States v. Abu Ali*, 528 F.3d 210, 232 (4th Cir. 2008) (quotation omitted).

A.

Mubdi argues that the officers lacked probable cause to believe he was speeding or following too closely. The relevant law on this issue is well settled. Although a traffic stop may be brief and for a limited purpose, it constitutes a "seizure" under the Fourth Amendment and must "not be 'unreasonable' under the circumstances." *Whren v. United States*, 517 U.S. 806, 809-10 (1996). Generally speaking, "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Id.* at 810; *see also United States v. Branch*, 537 F.3d 328, 335 (4th Cir. 2008) ("Observing a traffic violation provides sufficient justification for a police officer to detain the offending vehicle . . . ."). Probable cause exists if, given the totality of the circumstances, the officer "had reasonably trustworthy information . . . sufficient to warrant a prudent [person] in believing that the petitioner had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964).

1.

Mubdi first argues that there was no probable cause to stop him for speeding, notwithstanding that Officers York and

Wolfe independently estimated that he was driving eight to ten miles above the posted speed limit.

We have intimated, albeit in an unpublished opinion, that an officer's visual observation of a driver speeding may alone be sufficient to establish probable cause. *See United States v. Daras*, 164 F.3d 626, 1998 WL 726748, at *2 (4th Cir. 1998) (per curiam) (unpublished table decision) ("[T]he Government correctly points out that the officer's visual estimate is also sufficient, by itself, to support a conviction."); *see also United States v. Wornom*, 754 F. Supp. 517, 519 (W.D. Va. 1991) (affirming a magistrate judge's conviction of a defendant for speeding based solely on an officer's visual speed estimate after radar evidence was suppressed).

But we also recently concluded that "the Fourth Amendment does not allow, and the case law does not support, blanket approval for the proposition that an officer's visual speed estimate, in and of itself, will always suffice as a basis for probable cause to initiate a traffic stop." *United States v. Sowards*, No. 10-4133, slip op. at 14 (4th Cir. June 26, 2012). In *Sowards*, this same district court denied a motion to suppress evidence seized following a traffic stop of the defendant's vehicle, finding that the officer's visual speed estimate (of seventy-five miles per hour in a seventy mile per hour zone) alone established probable cause to initiate the stop. *Id.* at 7-8.

We reversed, finding that it was clear error for the district court to discount as immaterial the officer's obvious difficulty with measurements as it pertained to his ability to estimate the defendant's speed. *Id.* at 13. Among other patent errors, the officer in that case testified that there are twelve feet in a yard, twelve inches on a yardstick, and the number of inches on a yardstick depends on the yardstick. *Id.* at 12. The officer nonetheless insisted his estimate was accurate in that he had tracked the vehicle for 100 yards. Because the record showed that the officer was, to put it mildly, measurement-challenged,

we lacked confidence in his visual estimate, particularly given the modest five mile per hour differential between the posted speed limit and the defendant's alleged speed. *Id.* at 19.

The *Sowards* majority noted that our starting point in such cases is to determine "whether a vehicle's speed is estimated to be in significant excess or slight excess of the legal speed limit." *Id.* at 14. For significant excesses of the legal speed limit, "the speed differential—i.e., the percentage difference between the estimated speed and the legal speed limit—may *itself* provide sufficient 'indicia of reliability' to support an officer's probable cause." *Id.* at 15 (emphasis added). On the other hand,

> where an officer estimates that a vehicle is travelling in only slight excess of the legal speed limit, and particularly where the alleged violation is at a speed differential difficult for the naked eye to discern, an officer's visual speed estimate requires additional indicia of reliability to support probable cause.

*Id.* at 16. While "[s]uch additional indicia of reliability," the opinion expounded, "need not require great exactions of time and mathematical skill that an officer may not have, . . . they do require some factual circumstance that supports a reasonable belief that a traffic violation has occurred." *Id.* at 18.

*Sowards* further suggested that certain techniques, such as "radar [or] pacing methods," *id.* at 17, might suffice to corroborate an officer's visual estimate in cases of slight excesses of the legal speed limit. The majority opinion nevertheless emphasizes, though, that the touchstone of the probable cause inquiry is—as always—reasonableness, and the analysis remains whether the "totality of the circumstances" establishes "the reasonableness of the officer's visual speed estimate." *Id.* at 17.[6]

---

[6]Chief Judge Traxler wrote a vigorous and well-reasoned dissent in *Sowards*, contending that the majority incorrectly imposed an iron-clad

Here, even assuming that Mubdi was only slightly exceeding the legal speed limit, the record supports the reasonableness of the officers' visual speed estimates, and thus the decision to conduct the stop. Unlike in *Sowards*, we have before us two independent and virtually identical estimates as to Mubdi's speed by officers who were required, as part of a radar certification class, to visually estimate the speed of vehicles within a narrow margin of error.[7] In our view, this tandem evidence alone provides sufficient corroboration to support a finding of probable cause, particularly where the record—again unlike the one in *Sowards*—does not cast a shred of doubt on the officers' ability to estimate speed or on the accuracy of their visual estimates.

In sum, we discern no clear error in the district court's conclusion that Mubdi was speeding, based on its separate factual findings that York and Wolfe were trained in estimating vehicle speed and that their testimony regarding Mubdi's rate of

rule prohibiting in every instance a probable cause finding based solely on visual speed estimates where a vehicle is traveling only in "slight excess" of the speed limit. *Sowards*, slip op. at 26 (Traxler, J., dissenting). In our view, however, the majority's opinion is not quite so inflexible, and it certainly does not purport to reject a district court's consideration of the totality of the circumstances in making its probable cause determination. *Id.* at 17. We are satisfied that the totality of the circumstances present here supports the district court's ruling.

[7]The fact that an officer may err on any given speed estimate and still obtain certification, as discussed above, is not dispositive to our inquiry here. The government's probable cause burden requires no more than a reasonable ground to believe that an offense has been committed, a standard far less exacting than that imposed on the government to prove guilt beyond a reasonable doubt. Indeed, we recently emphasized that "'[f]inely-tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in a [probable cause] decision because probable cause is only the probability, and not a prima facie showing, of criminal activity.'" *United States v. Ortiz*, 669 F.3d 439, 445 (4th Cir. 2012) (quoting *Illinois v. Gates*, 462 U.S. 213, 235 (1983)).

speed was credible. Reviewing the probable cause determination de novo, we agree with the district court that the traffic stop was supported by the officers' reasonable belief that Mubdi was speeding.

2.

Mubdi also challenges the district court's separate finding that his following too closely behind Wolfe's patrol car justified the traffic stop. Mubdi rightly notes that the North Carolina statute proscribing motorists from following too closely, N.C. Gen. Stat. § 20-152, is inapplicable when a motorist is overtaking another. He contends that, because he was overtaking a slower-moving truck in front of him in the right lane when he merged behind Wolfe, his conduct was permissible. As such, Mubdi argues that the officers made a mistake of law by believing that he violated the statute. Tying up this argument, Mubdi asserts that the officers' decision to stop him for following too closely was improper because "a mistake of law cannot provide reasonable suspicion or probable cause to justify a traffic stop." Appellant's Reply Br. 4 (quoting *United States v. Chanthasouxat*, 342 F.3d 1271, 1279 (11th Cir. 2003) (concluding that "an officer's reasonable mistake of fact may provide the objective grounds for reasonable suspicion or probable cause required to justify a traffic stop, but an officer's mistake of law may not")).

Mubdi's argument here fails for two reasons. First, the evidence is at best conflicting as to whether Mubdi merged in the left lane behind Wolfe's patrol car to overtake a slower-moving vehicle, a necessary precondition for his conduct to be permissible under the statute. On this point, Mubdi simply averred that "there was a truck in front of [him] and to get around it, [he] merged behind the officer that was on the side." J.A. 269. On the other hand, York testified that "the Dodge Magnum ma[d]e a left behind [Wolfe] in a very close distance[, and] the truck [was] . . . at least ten car lengths in front of [Mubdi]." *Id.* 162. Additionally, Wolfe stated that he

"wouldn't say that [Mubdi] was getting ready to hit the truck or anything. They had plenty of time—they had more time to travel behind the vehicle before anything unsafe was to happen." *Id.* 250. In fact, the traffic stop video, submitted as an exhibit to the motion, appears to bear out the officers' testimony.

Viewing the evidence in the light most favorable to the government, as we must when a motion to suppress has been denied, *Kelly*, 592 F.3d at 589, Mubdi falls far short of showing that his conduct was permissible under section 20-152 in the first place.

But even assuming that the officers were mistaken as to the distance between Mubdi and the truck in front of him in the right lane, and thus whether Mubdi merged into the left lane to overtake the truck, such a mistake is patently a mistake of fact. Nothing in the record suggests that the officers were unaware that section 20-152 exempts drivers from the prohibition on following too closely while they are overtaking a slower-moving vehicle.

Thus, to the extent that the officers honestly—although perhaps mistakenly—believed that Mubdi was violating section 20-152 by following Wolfe too closely while not overtaking a vehicle, this mistake is at most a reasonable one under the circumstances, which does not undermine the district court's conclusion that the officers had probable cause to execute the stop in the first instance. *See Chanthasouxat*, 342 F.3d at 1276 ("[I]f an officer makes a traffic stop based on a mistake of fact, the only question is whether his mistake of fact was reasonable.").

Reviewing the probable cause determination de novo as it pertains to Mubdi's following too closely, we agree with the district court that the traffic stop was justified on this basis as well.

## B.

We next analyze whether the officers' subsequent actions were " 'reasonably related in scope to the circumstances that justified the [stop].' " *See United States v. Rusher*, 966 F.2d 868, 875 (4th Cir. 1992) (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)). Traffic stops must be limited in both scope and duration. *See Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion). With respect to scope, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Id.* As for duration, the police must "diligently pursue[ ] a means of investigation that [is] likely to confirm or dispel their suspicions quickly." *United States v. Sharpe*, 470 U.S. 675, 686 (1985); *see also Illinois v. Caballes*, 543 U.S. 405, 407 (2005) (noting that a traffic stop may become "unlawful if it is prolonged beyond the time reasonably required to complete [its] mission"); *Royer*, 460 U.S. at 500 (noting that the scope of a seizure "must be carefully tailored to its underlying justification," and that the government bears the burden to "demonstrate that the seizure it seeks to justify . . . was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure").

In the context of traffic stops, police diligence encompasses requesting a driver's license and vehicle registration, running a computer check, and issuing a ticket. *United States v. Foreman*, 369 F.3d 776, 781 (4th Cir. 2004); *see also Branch*, 537 F.3d at 337 ("If a police officer observes a traffic violation, he is justified in stopping the vehicle for long enough to issue the driver a citation and determine that the driver is entitled to operate his vehicle."). If a police officer seeks to prolong a traffic stop to allow for investigation into a matter outside the scope of the initial stop, he must possess reasonable suspicion or receive the driver's consent. *Branch*, 537 F.3d at 336. Additionally, "if the driver obstructs the police officer's efforts in any way—for example, by providing inaccurate

information—a longer traffic stop would not be unreasonable." *Id.*

Addressing Mubdi's argument that the officers unlawfully prolonged the stop, the district court concluded as follows:

> The duration of the seizure was reasonable for the purpose of performing a routine traffic stop, particularly in light of the fact that it involved a determination of a rental contract which was submitted by the driver, Mr. Mubdi. The time of the detention for the purpose of the traffic stop was reasonable under the circumstances and the totality thereof. And it was further testified [sic] by the growing reasonable suspicion of the officers. So even taken as a gross amount of time, it's still reasonable.

J.A. 338-39.

On appeal, Mubdi asserts that the officers lacked reasonable suspicion to detain him after York issued the warning ticket, which resulted in the warrantless search of his car that uncovered the drugs and firearms. We disagree.

First, the district court correctly concluded that the officers' actions were no more intrusive than necessary and that they diligently pursued a means of investigation to confirm or dispel their suspicions. In *Branch*, we held that a traffic violation authorizes "a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop," such as "request[ing] a driver's license and vehicle registration, run[ning] a computer check, and issu[ing] a citation." 537 F.3d at 335 (quotation omitted). The record reveals that York did not stray from this holding, as he asked Mubdi only "ordinary inquiries incident to a routine traffic stop," *id.* at 338 (quotation omitted), and undertook his inves-

tigation expeditiously, completing the warning citation within fifteen minutes.[8]

The district court also correctly determined that the following suspicious behavior supported York's decision to extend the investigation: (1) Mubdi took an excessive amount of time to pull over; (2) he was exceedingly nervous; (3) he kept his foot on the car brake instead of shifting the transmission into park; (4) he could not provide details as to his destination or the family member he intended to visit; (5) he did not rent the car, contrary to what he told York; (6) he was not authorized to drive the rental car; and (7) the car was beyond the bounds authorized by the rental contract.

Although some of these facts, viewed in isolation, might be consistent with innocent travel, the Supreme Court has recognized that such factors can, when taken together, give rise to reasonable suspicion. *United States v. Sokolow*, 490 U.S. 1, 9 (1989) ("Any one of these factors is not by itself proof of any illegal conduct and is quite consistent with innocent travel. But we think taken together they amount to reasonable suspicion."). Here, we have no trouble concluding that the circumstances supported York's decision to extend the stop to conduct the open-air canine sniff, which in turn alerted the officers to the presence of contraband in the car.

We have emphasized that reasonable suspicion "is not readily, or even usefully, reduced to a neat set of legal rules, but, rather, entails common sense, nontechnical conceptions that deal with factual and practical considerations of everyday life." *United States v. Mason*, 628 F.3d 123, 128 (4th Cir. 2010) (quoting *Foreman*, 369 F.3d at 781). As a reviewing court, we "consider the totality of the circumstances and give due weight to common sense judgments reached by officers

---

[8]Wolfe arrived at the scene of the stop with his drug-sniffing dog while York was issuing the warning citation, and thus the stop was not extended because of any delay in the arrival of a canine unit.

in light of their experience and training." *Id.* (quotation omitted). On this record, we decline to disturb the district court's order denying Mubdi's motion to suppress.

## III.

Lastly, Mubdi argues that the district court violated his Fifth and Sixth Amendment rights by increasing his statutory mandatory minimum sentence for the drug offenses based on improper judicial factfinding. Specifically, Mubdi contends that the district court's finding that he was responsible for 290.5 grams of crack cocaine violated his Fifth and Sixth Amendment rights to have any fact that triggers an enhanced mandatory minimum sentence charged in the indictment, submitted to a jury, and proved beyond a reasonable doubt. Without this finding, Mubdi argues that his guilty plea to crimes involving at least fifty grams of crack cocaine would have yielded only a ten-year mandatory minimum sentence. However, Mubdi acknowledges that Supreme Court precedent forecloses this argument. *See Harris v. United States*, 536 U.S. 545, 568 (2002) (holding that increasing minimum sentence based on judicial factfinding "does not evade the requirements of the Fifth and Sixth Amendments").

Accordingly, we affirm the district court's imposition of a 240-month sentence for Mubdi's drug convictions, which, when combined with the sixty-month consecutive sentence applied on the § 924(c) charge, properly yielded a 300-month term of incarceration.

## IV.

For the foregoing reasons, we affirm the judgment of the district court.

*AFFIRMED*

DAVIS, Circuit Judge, concurring in part and in the judgment:

> Judicial narratives that begin with a traffic stop are notable for their depressing sameness. Because of the nature of our judicial system, these narratives are typically inscribed in criminal prosecutions. Usually only those on whom contraband is found are charged with crimes, and those charged with crimes have the strongest incentive to challenge the stop that led to the discovery of contraband. Absent unusual events, courts tend to uphold such searches, finding them supported by probable cause.

> There is no poetry in these narratives. They read like the documentation of an audit. The police go about their business. Courts double-check them. In most cases, the court finds the law enforcement officers in compliance. In the process of all that process, we forget that–at least in criminal cases–someone's freedom is on the line.

Nancy Leong, The Open Road and the Traffic Stop: Narratives and Counter-Narratives of the American Dream, 64 Fla. L. Rev. 305, 328 (2012) (footnotes omitted) (hereafter, "*Open Road*").

In *Delaware v. Prouse*, 440 U.S. 648 (1979), the Supreme Court, applying the doctrine of *Terry v. Ohio*, 392 U.S. 1 (1968), definitively rejected, as inconsistent with the protections afforded by the Fourth Amendment, a claim to unfettered discretion to stop and detain motorists on the part of law enforcement officers seeking to uncover violations of the law:

> [W]e hold that except in those situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occu-

pant is otherwise subject to seizure for violation of law, stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment. This holding does not preclude the State of Delaware or other States from developing methods for spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion.

*Id.* at 663. Justice Rehnquist, dissenting, discerned "[no] sufficient basis to distinguish for Fourth Amendment purposes between a roadblock stopping all cars and the random stop" at issue in the case before the Court. *Id.* at 667. He scoffed at the majority's determined effort to protect individual liberty, accusing the majority of "elevat[ing] the adage 'misery loves company' to a novel role in Fourth Amendment jurisprudence." *Id.* at 664.

Seventeen years later, a unanimous Supreme Court effectively vitiated the protections afforded by *Prouse*. In *Whren v. United States*, 517 U.S. 806 (1996), the Court held that so long as an officer can offer a plausible account that he had probable cause a motorist committed a traffic infraction, whether the motorist could be stopped and detained was a matter entirely within the discretion of the officer.[1] Despite the potential for selective and discriminatory "traffic enforcement," the officer's "subjective intentions" in making the stop play no role in Fourth Amendment analysis. In particular, as the Court put it:

We of course agree with petitioners that the Constitution prohibits selective enforcement of the law based on considerations such as race. But the constitutional basis for objecting to intentionally discrimi-

---

[1]This circuit anticipated *Whren*'s holding in *United States v. Hassan El*, 5 F.3d 726, 729–31 (4th Cir. 1993), *cert. denied*, 511 U.S. 1006 (1994).

natory application of laws is the Equal Protection
Clause, not the Fourth Amendment. Subjective
intentions play no role in ordinary, probable-cause
Fourth Amendment analysis.

*Id.* at 813. *See generally* Wayne R. LaFave, The "Routine
Traffic Stop" from Start to Finish: Too Much "Routine," Not
Enough Fourth Amendment, 102 Mich. L. Rev. 1843 (2004).

Over the ensuing sixteen years, judges,[2] legal scholars,
social scientists, and many others have spilled much ink (and
the country has witnessed considerable political discourse)
exploring the ramifications of the Court's about-face. Specifi-
cally, we have wrestled with the inevitable role that
constitutionally-permissible "pretextual" traffic stops play in
what the Court referred to as "ordinary, probable-cause Fourth
Amendment analysis," *Whren*, 517 U.S. at 813, in light of the
growth of racial profiling.[3] Professor Leong has crafted a
cogent summary of the evolved legal regime:

---

[2]*See, e.g.*, *Atwater v. City of Lago Vista*, 532 U.S. 318, 372 (2001)
(O'Connor, J., dissenting) ("[A]s the recent debate over racial profiling
demonstrates all too clearly, a relatively minor traffic infraction may often
serve as an excuse for stopping and harassing an individual." (citing
*Whren*, 517 U.S. at 813)).

[3]At an earlier time, some law enforcement officers freely employed the
term "pretextual stop" although, with increased sensitivity over racial pro-
filing, the term seems to have fallen from favor. *See United States v. Fore-
man*, 369 F.3d 776, 786-87 (4th Cir. 2004) (Gregory, J., concurring in part
and dissenting in part):

Trooper Wade testified that he began to follow Foreman to
"see if I could find a violation," *id.* at 30 (emphasis added), and
admitted "[i]n an attempt to find a violation on [Foreman's] vehi-
cle . . . I was going to conduct a pretextual stop, stop him for a
traffic violation, conduct a brief interview of him, see if I
observed any indicators of other criminal activity . . . . " *Id.* at 60
(emphasis added). Because Trooper Wade paced Foreman's vehi-
cle at a speed of sixty-four miles per hour over a one-half mile
stretch of road where the speed limit was fifty-five, and observed
"items hanging from the inside rearview mirror," he activated his
emergency lights to make the stop, which Trooper Wade admit-
ted was pretextual. *See* R. vol. 4 at 2.

Whatever all this means in the abstract world of legal principles, the practical effect with respect to traffic stops is that when the police think a driver has committed any traffic violation, no matter how minor or how fleeting, they can pull him over. Thus, a driver might be pulled over for failing to signal for an appropriate length of time or for changing lanes too close to an intersection–things most of us routinely do on our daily commutes. The police can also pull over a driver when they lack enough evidence to establish probable cause of a violation if, under *Terry*, they have reasonable suspicion that criminal activity is afoot.

These standards allow police officers to exercise an enormous amount of discretion in performing traffic stops. Under current doctrine, the legal justification for stopping a car need not be the same as the real reason the police officer wants to stop the car, so long as a reasonable officer would have had probable cause to believe that a traffic infraction in fact took place. [Professor] Paul Butler [now of the Georgetown University Law Center] describes riding in a police cruiser with a police officer friend and playing a game his friend invented called "Stop that Car!" in which Butler "pick[s] a car–any car–and [the officer] stops it." Butler explains that his friend "is a good cop" because "[h]e waits until he has a legal reason to stop the car. It doesn't take long, never more than three or four blocks of following. There are so many potential traffic infractions that it is impossible to drive without committing one." The reality, then, is that the police are free to pick a car they wish to stop, follow it until the driver inevitably violates one of the vehicle code's myriad obscure provisions, and subsequently pull it over.

The Supreme Court has repeatedly interpreted the Constitution to permit this schism. Thus, even an

officer with no actual purpose other than to harass and annoy may–according to the Supreme Court–use a traffic stop as an entirely constitutional starting point for such actions, as long as an objectively reasonable evaluation would conclude that the officer had probable cause to believe that a traffic violation occurred at the time she made the stop.

From this starting point of an "objectively reasonable" stop supported by probable cause or reasonable suspicion, the judicial narrative then follows a well-worn script. Courts typically examine whether the circumstances justified the traffic stop, and–even more typically–answer that question in the affirmative. This is so even when the events of the traffic stop stray beyond its ostensible justification. The Court has explained: "An officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop."

*Open Road* at 326-27 (footnotes omitted).[4]

---

[4]For a sampling of some of the more recent literature in this genre, *see* Thomas B. McAffee, Setting Us Up For Disaster: The Supreme Court's Decision in *Terry v. Ohio*, 12 Nev. L.J. 609, 614-15 (2012) ("The further we go along, the clearer it becomes that there is widespread 'racialized policing,' what we have labeled as 'racial profiling,' and that its pervasive presence is so important in part because it is measurable . . . . The wide use of racial profiling is reinforced by *Terry*'s holding as well as by the way the suspicion standard has been expansively applied over time.") (footnotes omitted); Eric J. Miller, Detective Fiction: Race, Authority and the Fourth Amendment, 44 Ariz. St. L.J. 213, 220 (2012) (observing that "the Court is aware (through both dissenting opinions and some hints in recent majority opinions) that its jurisprudence is driven by the War on Drugs, and that the style of policing it endorses to fight that war is dragnet and racialized, and that the success rate for this style of policing is low") (footnotes omitted); Mary D. Fan, The Police Gamesmanship Dilemma in

Of course, the four-decades-and-counting "War on Drugs" has given a special context and meaning to the *Whren* doctrine and its implications for racial profiling. Beyond their undoubtedly sincere desire to do their jobs and to do them well and safely, local law enforcement officers and their employing agencies, such as the Statesville police department involved in this case, have serious skin in the drug interdiction game, no matter the ultimate destination of the contraband. *See, e.g.*, Ricardo J. Bascuas, Fourth Amendment Lessons from the Highway and the Subway: A Principled Approach to Suspicionless Searches, 38 Rutgers L.J. 719, 761-62 (2007) (discussing profits made by police from drug interdiction programs). It was not for nothing that officers York and Wolfe, each with a drug canine in his vehicle, started their shifts before nine in the morning sitting perpendicular to I-77 watching traffic, deciding which of the many vehicles passing them by they would follow and stop, abjuring the use of the speed radar devices.[5] Likewise, it was not

Criminal Procedure, 44 U.C. Davis L. Rev. 1407, 1463 (2011) ("In the decade since *Whren*, therefore, the problem of profiling has persisted while *Whren* stands as a controversial landmark of noninquiry and 'a license to make racial distinctions.' *Whren* is a lightning rod for controversy because the Court took a don't ask, don't tell approach allowing police to do whatever it takes—without examining the accuracy of police beliefs about what it takes, basing deference on noninquiry rules rather than data.") (footnotes omitted); *see also* Bernard E. Harcourt, Rethinking Racial Profiling: A Critique of the Economics, Civil Liberties, and Constitutional Literature, and of Criminal Profiling More Generally, 71 U. Chi. L. Rev. 1275 (2004).

[5] Insisting that the Statesville police were engaged in "criminal interdiction" and not merely "drug interdiction" at the time of the stop in this case, the officers' supervisor, Captain Dyson, testified at the suppression hearing that York and Wolfe were "looking for criminals" who might be driving north on I-77 that morning. J.A. 126. The cross-examination of Dyson included the following:

> Q. So how do you determine whether a motorist is a criminal or not?

for nothing that, as shown on the video taken by the dashboard camera in York's vehicle, the officers in this case expressed unmitigated glee, punctuated by serial "fist-bumps" all around, when the cache of more than two hundred grams of crack cocaine was removed from the Dodge Magnum.

All that said, this court has done (and will continue to do) what it can to hold true the line between excessive law enforcement zeal that transgresses constitutional limits, on the one hand, and legitimate law enforcement techniques respectful of constitutional constraints, on the other hand. *See, e.g.*, *United States v. Digiovanni*, 650 F.3d 498 (4th Cir. 2011) (affirming district court's grant of motion to suppress evidence seized after a traffic stop). At the constitutional margins, of course, one may yet legitimately question why, as Professor Leong correctly observed (and especially as the government bears the burden of proof), close calls seem always to go to law enforcement. *See, e.g.*, *United States v. Mason*, 628 F.3d 123, 132 (4th Cir. 2010) (holding that questioning of motorist and passenger unrelated to the basis for the traffic stop that took "one to two minutes" did not render stop unreasonable because the stop was conducted "promptly and with efficiency"); *but see id.* at 134-35 (Gregory, J., dissenting) (disagreeing that duration of stop was reasonable, where detaining officer described African-American occupants of stopped car as "spooky spooky" and officer's testimony

---

A. There's a bunch of things you look at. You look at criminal indicators when they're coming by. How they position themselves when they come by. The expression they might give or the expression they don't give. Or when they come by, somebody might just turn up a drink all of a sudden for no reason. Or when they come by – you're sitting there watching traffic. All of a sudden when the car comes by, they all of a sudden take their hand and cover their face when they come by. It's something that draws your attention to them. But you're also looking for a motor vehicle violation.

J.A. 128.

sought to justify reasonable suspicion based on officer's "experience" and "sort of gut instinct"). To be sure, given the relative institutional competencies between district and circuit courts, and given the controlling standards of review of suppression rulings, *see* ante 7, trial judges, not the judges of this court, have the primary role in policing the police.

Our recent decision in *United States v. Sowards*, ___ F.3d ___, 2012 WL 2386605 (4th Cir. June 26, 2012), is wholly consistent with our on-going efforts; it lays down an important marker that there are indeed limits to the scope of law enforcement creativity inherent in the otherwise standardless *Whren* doctrine. Unlike the majority here, however, I cannot identify any material differences in the facts at hand that will support a difference in outcome between this case and the outcome in *Sowards* on the issue of uncorroborated visual speed estimates, although I fully agree that *Sowards* does not sound the death knell to the use of visual speed estimates by law enforcement officers.[6] Accordingly, as to the justification for the vehicle stop in this case, I join only Part II.A.2 of the majority opinion, which, as an alternative holding, sustains the district court's determination that the ostensible following-too-closely violation supported the existence of probable cause to effect the vehicle stop here. I also concur in Parts I, II.B., and III of the majority opinion, and in the judgment.

---

[6]Interestingly, the evidence at the suppression hearing, including the officers' testimony and images from the video taken by York's dashboard camera, indicated that over the approximately five miles during which officers York and Wolfe surveilled Mubdi after they first observed the Dodge Magnum, the posted speed limits on I-77 and I-40 increased from fifty-five miles per hour (where the officers first observed Mubdi), to sixty miles per hour, to sixty-five miles per hour at the location where the traffic stop was finally effected. Apparently, the officers set up their "criminal interdiction" operation, in which visual estimates of vehicle speeds played a major role, at an optimal location to stop vehicles traveling more than the posted fifty-five mile per hour limit, and just before the limit increased to sixty, and then to sixty-five, miles per hour.