<u>**UNPUBLISHED**</u>

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 10-4701**

─────────────

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

ANTHONY SELLERS,

Defendant – Appellant.

─────────────

**No. 10-4702**

─────────────

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

ALCINDO ROCHELLE MATTHEWS,

Defendant – Appellant.

─────────────

**No. 10-4917**

─────────────

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

SIGMUND DIAOLA JAMES, a/k/a Sig,

      Defendant – Appellant.

––––––––––

Appeals from the United States District Court for the District of South Carolina, at Orangeburg. Margaret B. Seymour, District Judge. (5:08-cr-00944-MBS-21; 5:08-cr-00944-MBS-18; 5:08-cr-00944-MBS-1)

––––––––––

Argued: September 21, 2012      Decided: February 28, 2013

––––––––––

Before SHEDD, KEENAN, and THACKER, Circuit Judges.

––––––––––

Affirmed in part, vacated in part, and remanded by unpublished per curiam opinion. Judge Shedd wrote a separate opinion concurring in part and dissenting in part.

––––––––––

**ARGUED:** Beattie Balentine Ashmore, BEATTIE B. ASHMORE, PA, Greenville, South Carolina; Jan Simpson Strifling, Columbia, South Carolina, for Appellants. John David Rowell, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellee. **ON BRIEF:** Bradley M. Kirkland, BRADLEY M. KIRKLAND, LLC, Columbia, South Carolina, for Appellant Alcindo Rochelle Matthews. William N. Nettles, United States Attorney, Columbia, South Carolina, for Appellee.

––––––––––

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

On consolidated appeal, Appellants Anthony Sellers, Alcindo Rochelle Matthews, and Sigmund Diaola James challenge their convictions and subsequent sentences stemming from a drug conspiracy. Appellants dispute the admissibility of evidence gained from searches of their vehicles. Appellants Sellers and James also dispute the district court's calculation and proportionality of their life sentences. For the following reasons, we affirm Appellants' convictions. We conclude, however, that the district court erred in sentencing Appellant James by applying the murder cross-reference provision in United States Sentencing Guidelines Manual ("Guidelines") § 2D1.1(d) and in treating as relevant conduct, an unrelated and uncharged murder. Accordingly, we vacate James's sentence and remand for resentencing.

I.

The events of this case stem from the surveillance of Sellers, Matthews, James, and others by Drug Enforcement Agency ("DEA") agents and Orangeburg County officers regarding possible drug-related activities in Orangeburg, South Carolina. On May 21, 2007, South Carolina state highway patrol officers stopped James for speeding. Upon running James's license and registration, Officer James LaChance was informed James had an

3

outstanding warrant in Orangeburg County. After James was detained, he alerted Officer LaChance to money inside the vehicle. Officer LaChance then returned to the vehicle and located the money inside the console along with a rear-facing video camera. Other officers, including a K-9 search team, subsequently continued to search James's vehicle.

Following James's arrest and the search of James's vehicle, DEA agents continued to surveil James's whereabouts. On January 16, 2008, the DEA secured a wiretap of James's telephone. On January 19, 2008, the DEA, acting without a warrant, placed an electronic Global Positioning System ("GPS") device on the exterior of James's vehicle. Over the course of the next several days, DEA agents used the GPS device to track James's whereabouts. On February 2, 2008, the GPS device ceased transmitting, apparently because the device's batteries had been exhausted. On March 6, 2008, agents removed the device from James's vehicle. Relying partially on information gained from the use of the GPS device, the DEA then secured another wiretap of James's phone on February 13, 2008, and again on March 16, 2008. A total of seven wiretaps were issued from January 2008 to July 2008 to secure evidence of the scope of the drug conspiracy at issue in this case.

On August 14, 2008, Sellers was stopped by police for an improper lane change while driving. Upon approaching the

4

vehicle, Officers Phillip Furtick and Terry Logan noticed a strong odor of marijuana. Officer Furtick asked Sellers and his passenger to step out of the vehicle, at which point Sellers admitted to there being marijuana inside the vehicle. Officer Logan also observed a partially hidden bag of what appeared to be cocaine under the passenger seat as the passenger exited the vehicle. The police officers then placed Sellers and his passenger under arrest and searched the vehicle. The search uncovered marijuana, cocaine, a pistol, and roughly $3,000.

On September 17, 2008, as a result of the evidence gained from the search of James's and Sellers's vehicles, the GPS surveillance, the wiretaps, and other information, James, Sellers, and Matthews were indicted on drug conspiracy charges.

Following a series of superseding indictments, in the third superseding indictment James was ultimately indicted on the following seven charges: (1) conspiracy to possess with intent to distribute five kilograms or more of cocaine and 50 grams or more of cocaine base in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846; (2) use of a communication facility to facilitate said conspiracy in violation of 21 U.S.C. § 843(b) and 18 U.S.C. § 2; (3) possession with intent to distribute 500 grams or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 18 U.S.C. § 2; (4) possession with intent to distribute a quantity of cocaine in

5

violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 18 U.S.C. § 2; (5) money laundering in violation of 18 U.S.C. §§ 2, 1956(a)(1)(A)(i), 1956(a)(1)(B)(i), and 1956(h); (6) possession with intent to distribute a quantity of cocaine within 1,000 feet of a school in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), 860(a), and 18 U.S.C. § 2; and (7) possession with intent to distribute 500 grams or more of cocaine within 1,000 feet of a school in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), 860(a), and 18 U.S.C. § 2.

Sellers was indicted on the following five charges: (1) conspiracy to possess with intent to distribute five kilograms or more of cocaine and 50 grams or more of cocaine base in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846; (2) possession with intent to distribute a quantity of cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 18 U.S.C. § 2; (3) knowingly possessing and using a firearm during, in relation to and in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1); (4) felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2), and 924(e); and (5) aiding and abetting in possession with intent to distribute a quantity of cocaine within 1,000 feet of a school in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), 860(a), and 18 U.S.C. § 2.

6

Matthews was indicted on the following charge: money laundering in violation of 18 U.S.C. §§ 2, 1956(a)(1)(A)(i), 1956(a)(1)(B)(i), and 1956(h).

Appellants pled not guilty and a jury trial commenced. At trial, Appellants moved to suppress evidence gained from the search of James's vehicle, information gathered from the GPS device including the wiretaps that relied in part on the GPS data, and the search of Sellers's vehicle. The district court denied Appellants' motions to suppress. The jury found James, Sellers, and Matthews guilty on all counts.

During sentencing, the district court found by a preponderance of the evidence that in 2004 James had also committed the murder of Vance Davis. Relying on testimony from witnesses confirming James murdered Davis and at the time James was involved in the drug trade, the district court attributed Davis's murder to James as conduct relevant to the drug conspiracy under Guidelines § 1B1.3(a). Over James's objection, the district court adopted the pre-sentence investigation report and applied the cross-reference found in Guidelines § 2D1.1(d)(1) for first degree murder, Guidelines § 2A1.1, to increase James's base offense level from 38 to 43.

James and Sellers were sentenced to life in prison on August 19, 2010 and June 17, 2010, respectively. Matthews was sentenced to 24 months in prison on June 17, 2010. Appellants

7

each filed timely appeals to this court. James, Sellers, and Matthews challenge the district court's denial of their motions to suppress evidence gained from the searches of James's and Sellers's vehicles and the information gained from the GPS and resulting wiretaps. James and Sellers also appeal the district court's imposition of their life sentences.

Thus, this court possesses jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

II.

On appeal, Appellants challenge the district court's denial of their motions to suppress various categories of evidence. The following categories warrant our discussion here, and each will be addressed in turn: (A) evidence gained from the search of James's vehicle; (B) evidence gained from the search of Sellers's vehicle; and (C) the installation and use of a GPS device on James's vehicle and the subsequent wiretaps that relied on the GPS information.

When reviewing a district court's denial of a motion to suppress, this court reviews legal conclusions de novo, and any factual determinations for clear error. United States v. Kelly, 592 F.3d 586, 589 (4th Cir. 2010). When the district court denies a defendant's motion to suppress, as the reviewing court, we construe the evidence in the light most favorable to

the government.  Id.  In the event we find a constitutional error on direct review, "the government has the burden of proving that a constitutional error was 'harmless beyond a reasonable doubt.'"  Bauberger v. Haynes, 632 F.3d 100, 104 (4th Cir. 2011) (quoting Chapman v. California, 386 U.S. 18, 24 (1967)).

When reviewing a district court's determination of necessity for the authorization of the interception of communications under 18 U.S.C. § 2518, we review for an abuse of discretion.  United States v. Wilson, 484 F.3d 267, 280 (4th Cir. 2007).

A.

Search of James's Vehicle

James argues the district court erred when it denied his motion to suppress and found evidence gained from the search of his vehicle admissible as the product of a valid inventory search.

As a starting point, to comply with the Fourth Amendment's prohibition against unreasonable searches and seizures, generally police must obtain a warrant before conducting a search.  Kelly, 592 F.3d at 589 (4th Cir. 2010).  A warrantless search may be valid however, and the resulting evidence admissible, if the search is conducted "'within one of the narrow and well-delineated exceptions' to the Fourth

9

Amendment's warrant requirement." United States v. Currence, 446 F.3d 554, 556 (4th Cir. 2006) (quoting Flippo v. West Virginia, 528 U.S. 11, 13 (1999)). One such exception includes evidence gained from a valid inventory search. United States v. Matthews, 591 F.3d 230, 234 (4th Cir. 2009) (citing United States v. Banks, 482 F.3d 733, 738-39 (4th Cir. 2007)).

The inventory search exception is applied when police officers impound vehicles or detain suspects. Matthews, 591 F.3d at 235. Its justifications are two-fold; an inventory search serves to protect the detainee's property, and also protects the police from accusations of theft and from potentially dangerous items. Id. Once a suspect is detained, the inventory search exception does not give arresting officers carte blanche to rummage through the detainee's property looking for possible evidence of criminal activity. In order for the inventory search exception to apply, the search must have been performed pursuant to standardized criteria -- such as a uniform policy -- and such criteria must have been administered in good faith. United States v. Banks, 482 F.3d 733, 739 (4th Cir. 2007). Importantly, "nothing prohibits the discretion of police officers in making inventory searches so long as that discretion is based on standard criteria and on the basis of something other than the suspicion of criminal activity." United States

10

v. Ford, 986 F.2d 57, 60 (4th Cir. 1993) (citing Colorado v. Bertine, 479 U.S. 367, 375 (1987)).

In this case, after police stopped and arrested James, James indicated to police that he had a significant amount of cash inside the vehicle. Prior to discovery of the money and rear-facing camera, Officer LaChance conducted the inventory search in compliance with state highway patrol procedures and in good faith in response to James's notification that he had money in the vehicle. At the suppression hearing, Officer LaChance testified that the South Carolina state highway patrol inventory search procedures require officers to start searching on one side of a vehicle and progressively search to the other side. In the police video submitted to the district court, Officer LaChance clearly begins his search with the driver's side door, before moving to the driver's seat, and finally the inner console. Once Officer LaChance located the money in the inner console, he stopped his search and sought confirmation from his fellow officers that the money had been found. Also during this search, Officer LaChance noted the rear-facing camera installed on the dashboard.

Most of James's objections center around the events that followed. After initially locating the money and rear-facing camera, a K-9 crew was called in and other officers repeatedly searched portions of James's vehicle. James argues

these repeated searches were not conducted pursuant to police inventory policy and were administered merely in an attempt to locate incriminating evidence.

James's reliance on these arguments is misplaced. This court need not consider whether the subsequent searches were valid inventory searches simply because they produced no evidence that was ever admitted at trial. The money and rear-facing camera were discovered while Officer LaChance first initiated his inventory search pursuant to official policy. If, in fact, the subsequent searches by other officers and the K-9 search were not performed according to official policy or were performed in bad faith, it is of no moment because there is no indication in the record that any testimony related to the subsequent searches or physical evidence discovered during the subsequent searches was ever admitted at trial. Therefore, the district court did not err in denying James's motion to suppress and allowing the money and photographs to be admitted as evidence that was discovered pursuant to a valid inventory search.

## B.

### Search of Sellers's Vehicle

Sellers argues the district court erred when it denied his motion to suppress and found evidence gained from the search of his vehicle admissible. Sellers contends the search of his

vehicle violated his Fourth Amendment right to be free from unreasonable searches and seizures, because the search did not fall within the parameters of the exception to the warrant requirement for the search of a vehicle incident to a recent occupant's arrest, as articulated by the Supreme Court in Arizona v. Gant, 556 U.S. 332 (2009).

Sellers mistakenly relies only on select portions of the Gant decision, and ignores other Supreme Court precedent. In Gant, the Supreme Court clarified the rules governing a search of an automobile incident to arrest set forth in New York v. Belton, 453 U.S. 454 (1981), and held that two circumstances could authorize a warrantless search of a vehicle incident to an arrest: (1) the possibility of access to the vehicle by a recent occupant; or (2) the likelihood of discovering evidence related to the offense of arrest. 556 U.S. at 343 ("Accordingly, we . . . hold that . . . [police may] search a vehicle incident to a recent occupant's arrest only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search. . . . [W]e also conclude that circumstances unique to the vehicle context justify a search incident to a lawful arrest when it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." (footnote, citations, and internal quotation marks omitted)).

13

Here, police officers made a valid stop of Sellers for a traffic violation. See United States v. Hassan El, 5 F.3d 726, 730 (4th Cir. 1993). Upon making the stop, the officers were permitted to direct Sellers and his passenger out of the vehicle. See Maryland v. Wilson, 519 U.S. 408, 415 (1997). If these were the only facts of this case, then the search would not have been permissible under Gant because Sellers and his passenger did not have access to the interior of the vehicle, and there would have been no basis for officers to believe there was a likelihood of discovering evidence related to a traffic violation inside the vehicle.

Importantly, however, the police officers in this case possessed more information. Officers Furtick and Logan noticed a strong odor of marijuana emanating from the vehicle, Sellers admitted to there being marijuana inside the vehicle, and Officer Logan observed a partially hidden bag of what appeared to be cocaine under the passenger seat as the passenger exited the vehicle.

In Gant, the Supreme Court noted that the search incident-to-arrest exception is not the only exception that may justify the search of a vehicle. 556 U.S. at 346. Indeed, "[o]ther established exceptions to the warrant requirement authorize a vehicle search under additional circumstances when safety or evidentiary concerns demand." Id. Most germane to

14

this case, "[i]f there is probable cause to believe a vehicle contains evidence of criminal activity, United States v. Ross, authorizes a search of any area of the vehicle in which the evidence might be found." Id. at 347 (citation omitted).

In this case, the drug-related odor, admission, and visual identification clearly gave police officers probable cause to believe the vehicle contained evidence of criminal activity and justified the search under United States v. Ross, 456 U.S. 798 (1982), even though the criminal drug activity was not the original offense that justified the arrest. The district court, therefore, did not err in denying Sellers's motion to suppress the drugs, gun, and money gathered during the search of Sellers's vehicle.

## C.

## GPS Device

James argues the district court erred by denying his motion to suppress evidence gained from the installation of a GPS device on his vehicle and its subsequent use. James contends the GPS tracking data should have been suppressed, as well as the resulting wiretaps that relied in part on the GPS data, as fruit of the poisonous tree.[1]

---

[1] Matthews also challenges the GPS data and wiretaps under the same theories as James and their challenges will be treated together.

15

While James's appeal was pending before this court, the Supreme Court in United States v. Jones, 132 S. Ct. 945 (2012) addressed the precise issue implicated by this case: whether the installation of a GPS tracking device to a target's vehicle, and its subsequent use, without a valid warrant, constituted an unlawful search. In Jones, the Supreme Court relied on the common-law trespassory test for a search -- noting that the Katz v. United States, 389 U.S. 347 (1967) reasonable-expectation-of-privacy test merely supplemented but did not replace the trespassory test -- and found that such installation and use violated the Fourth Amendment. 132 S. Ct. at 952. The Supreme Court also noted, "[t]respass alone does not qualify [as a search], but there must be conjoined with that what was present here: an attempt to find something or to obtain information." Id. at 951 n.5. Just as in Jones, the DEA agents in this case attached a GPS device to a target's vehicle and used the device to gain information about the target's whereabouts, all absent a valid warrant.[2] The search in this case, therefore, violated James's Fourth Amendment rights.

---

[2] To be fair, the officers in Jones acted pursuant to a warrant, albeit a warrant that had expired and was executed in the wrong location. See 132 S. Ct. at 948. In this case, there is no indication in the record that the DEA agents made any attempt to secure a warrant to authorize installation of the GPS device.

16

In its briefing, the government does not challenge the applicability of Jones to the present case. Rather, the government argues that because Jones was decided after the events of this case, the DEA's actions should be viewed through the good-faith standard as stated in Davis v. United States, 131 S. Ct. 2419 (2011), and therefore any evidence gained from the GPS installation and its use should not be subjected to the exclusionary rule. This court need not venture along this line of inquiry for the result is the same even if Davis does not apply.

1.

GPS Tracking Data

Even assuming Davis does not apply to this case, and the district court erred in denying James's motion to suppress evidence gained from the GPS device, there is no indication that any data gained from the GPS device was ever introduced at trial. The government has stated that no such evidence was introduced, and Appellants do not offer anything in the record to the contrary. It is self-evident that there can simply be no error in the admission of evidence when evidence is not admitted. Appellants simply do not identify any direct tracking information gained from the use of the GPS device that was ever introduced either in testimony or by exhibit.

17

2.

Wiretaps

The main thrust of James's argument on appeal, however, is not that the district court should have explicitly suppressed direct GPS data, but rather that the district court should have suppressed any evidence that was gained as a proximate result of the GPS data -- specifically the February through July 2008 wiretaps. In essence, James argues that because the wiretap applications in part contained information derived from an illegal GPS search, any evidence gained from the wiretaps should be suppressed as "fruit of the poisonous tree." James argues this result is required because without the GPS data, the wiretap applications lacked the required showing of probable cause and necessity. We disagree.

Congress has provided a statutory framework to guide the regulation of wiretapping and electronic surveillance. United States v. Apple, 915 F.2d 899, 904 (4th Cir. 1990). In order to issue a wiretap, a judge must determine, on the basis of the application for the wiretap, that probable cause exists to believe that (1) an individual is committing, has committed, or is about to commit an offense enumerated in 18 U.S.C. § 2516; (2) particular communications concerning that offense will be obtained by the wiretap; and (3) the target facilities will be used in connection with the offense. 18 U.S.C. § 2518(3); see

18

United States v. Webster, 639 F.2d 174, 177 (4th Cir. 1981). The trial judge must also determine (4) the necessity for the wiretap -- that is, normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or appear to be too dangerous. 18 U.S.C. § 2518(3)(c).

The wiretap statute also provides grounds for the suppression of wiretap communications. Id. §§ 2515; 2518(10)(a). For example, a defendant may seek suppression of wiretap communications when "the order of authorization or approval under which [the communication] was intercepted is insufficient on its face . . . ." Id. § 2518(10)(a)(ii). Although at issue here is the availability of suppression for a statutory violation, as a opposed to a constitutional violation, Fourth Amendment principles may also inform the court's analysis. See United States v. Clerkley, 556 F.2d 709, 719 (4th Cir. 1977) ("In other words, the violation must substantially impinge upon Fourth Amendment values sought to be protected by Congress in restricting and rendering uniform the use of wiretaps."); see also United States v. Baranek, 903 F.2d 1068, 1072 (6th Cir. 1990) (noting that although the wiretap statute may provide greater protection than the Fourth Amendment, Fourth Amendment evidence suppression doctrines are still relevant).

19

In this case, setting aside the allegedly impermissible GPS information contained in the wiretap application, the surviving information contained in the application remained sufficient to support a finding of probable cause and necessity required to issue the wiretap. See United States v. Gillenwaters, 890 F.2d 679, 681–82 (4th Cir. 1989) (recognizing that courts have set aside suspect material in an affidavit for a search warrant and then evaluated probable cause, even when the suspect information was obtained through an illegal search). Like the probable cause standard for a search warrant, the probable cause standard necessary to comply with 18 U.S.C. § 2518(3) requires not absolute certainty, but rather a "fair probability" that evidence of the subject offense will be uncovered given the totality of the circumstances. United States v. Depew, 932 F.2d 324, 327 (4th Cir. 1991) (citing United States v. Alfano, 838 F.2d 158, 161–62 (6th Cir. 1988)). Similarly, the showing of "necessity" for the wiretap is not prodigious and "the Government 'need only present specific factual information sufficient to establish that it has encountered difficulties in penetrating the criminal enterprise or in gathering evidence [such that] wiretapping becomes reasonable.'" United States v. Wilson, 484 F.3d 267, 281 (4th Cir. 2007) (quoting United States v. Smith, 31 F.3d 1294, 1298 (4th Cir. 1994)).

20

Excising the allegedly impermissible GPS information from the wiretap applications in this case, it is clear the wiretap applications satisfy the probable cause and necessity standards. For example, the affidavits set forth the array of investigatory techniques DEA officers employed to shed light on the drug conspiracy. The techniques employed by DEA officers included extensive stationary and mobile physical surveillance, interviews, telephone pen registers, telephone toll records, and the analysis of public records. The affidavits also describe the difficulties faced by officers in this case, including: performing discreet mobile and stationary surveillance and collecting garbage in the sparsely populated rural environment of the targets; electronic counter-surveillance measures and "look-outs" employed by the targets; evasive measures taken by targets in response to perceived surveillance; and the inability to insert undercover agents in, or recruit confidential sources from, the target's organization. This showing was sufficient. Although the district court abused its discretion in relying on the additional GPS information in issuing the wiretaps, inclusion of this information was harmless beyond a reasonable doubt and a good faith inquiry under Davis is not required. See Bauberger v. Haynes, 632 F.3d 100, 104 (4th Cir. 2011).

Therefore, we affirm the convictions of Appellants James, Sellers, and Matthews.

Appellants James and Sellers also challenge the district court's imposition of a life sentence. James argues the district court erred when it found by a preponderance of the evidence that he murdered Vance Davis and attributed the murder at sentencing, as "relevant conduct" to the drug conspiracy in this case. James and Sellers also both argue their life sentences are not proportional to their crimes and therefore violate the Eighth Amendment's prohibition on cruel and unusual punishment.

In reviewing a sentence imposed by the district court, we review for both procedural and substantive reasonableness. United States v. Lynn, 592 F.3d 572, 575 (4th Cir. 2010). We review unpreserved challenges of procedural sentencing error for plain error. Id. at 576–77. We review preserved challenges of procedural sentencing error for an abuse of discretion and reverse unless we conclude that the error was harmless. Id. at 576. If the sentence is procedurally reasonable, we then review the underlying substantive reasonableness of the sentence under an abuse of discretion standard. Id. at 575. If we find the sentence to be procedurally unreasonable, we are foreclosed from reviewing the underlying substantive reasonableness of the sentence. United States v. Horton, 693 F.3d 463, 472 (4th Cir. 2012).

In reviewing whether a sentence is within the constitutional limits of the Eighth Amendment's prohibition against "cruel and unusual punishments" an appellate court asks whether the imposed sentence is proportionate to the crime committed. Solem v. Helm, 463 U.S. 277, 290 (1983). To determine proportionality, we consider "(1) the gravity of the offense and the harshness of the penalty; (2) the sentences imposed on other criminals in the same jurisdiction; and (3) the sentences imposed for commission of the same crime in other jurisdictions." United States v. Wellman, 663, F.3d 224, 231 (4th Cir. 2011) (citing Solem, 463 U.S. at 292).

A.

Relevant Conduct Enhancement

During sentencing, the district court found by a preponderance of the evidence that James had committed the murder of Vance Davis and that this qualified as relevant conduct under the sentencing guidelines. Specifically, the district court relied on two witnesses who confirmed that James murdered Davis. Over James's objection, the district court adopted the pre-sentence investigation report and applied the cross-reference found in Guidelines § 2D1.1(d)(1) for first degree murder, Guidelines § 2A1.1. This application of the cross-reference increased James's offense level under § 2D1.1 from 38 to 43.

23

In reviewing an enhancement for relevant conduct for procedural error, we conduct two separate analyses. First, we review for clear error the district court's factual finding that the defendant committed the relevant conduct offense by a preponderance of the evidence. Horton, 693 F.3d at 474–75. Second, we review de novo the district court's legal determination that the relevant conduct offense qualifies for the applicable cross-reference provision in the Guidelines. Id.

As this court noted in Horton, the clear error standard of review is "very deferential" toward the factual findings made by the district court. 693 F.3d at 474. At sentencing, the district court heard testimony by two witnesses, Robert Jones and Avery Haigler, each indicating James had murdered Vance Davis. Although James pointed out that there were certain discrepancies between other evidence and the testimony of Jones and Haigler, that fact alone, does not overcome the fact that there was a sufficient amount of evidence for the court to conclude, by a preponderance of the evidence, that James murdered Davis.

Finding the district court did not clearly err in its factual determination that James murdered Davis, we now turn to the legal question of whether the relevant conduct offense can be applied under the cross-reference provision. In reviewing the district court's determination of relevant conduct for

24

sentencing purposes, the interrelation of two provisions in the Guidelines requires discussion: (1) § 2D1.1(d) ("the Cross-Reference Provision"); and (2) § 1B1.3 ("the Relevant Conduct Guideline").

The offense level for James's offenses of conviction -- the drug conspiracy and possession convictions -- is established under Guideline § 2D1.1. Subsection (d) of § 2D1.1 provides the Cross-Reference Provision, which states in relevant part: "If a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111 . . . apply § 2A1.1 (First Degree Murder) or § 2A1.2 (Second Degree Murder), as appropriate, if the resulting offense level is greater than that determined under this guideline." USSG § 2D1.1(d)(1).

Unless otherwise specified in the Guidelines, the application of the Cross-Reference Provision depends on whether the cross-referenced offense -- in this case, first degree murder -- constitutes relevant conduct under the Relevant Conduct Guideline found in § 1B1.3(a). Horton, 693 F.3d at 476. Neither the parties, the district court, nor the Pre-Sentence Investigation Report identifies whether the cross-referenced offense should be considered relevant conduct under § 1B1.3(a)(1) or § 1B1.3(a)(2), or any other provision for that matter. Under any provision, however, we find the cross-

25

referenced murder offense not to be relevant conduct attributable to the drug conspiracy in this case.

The Relevant Conduct Guideline, § 1B1.3(a), states in relevant part, that the application of a cross-reference shall be determined on the basis of:

> (1)(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
>
> ***
>
> that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;
>
> (2) solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction; . . . .

USSG § 1B1.3(a).

Here, the Davis murder cannot be considered relevant conduct under either provision. First, with respect to § 1B1.3(a)(1)(A), the evidence is insufficient to conclude that the murder occurred during, in preparation for, or in the course of attempting the drug conspiracy in this case. While all the witnesses at sentencing agreed James had murdered Davis, their testimony was inconsistent, at best, as to whether the murder involved drug-related activities, or was an act of vengeance for Davis's alleged attempted robbery of James's mother's residence.

26

Although James's pre-sentence report indicates that Lenell Walker stated to police officers that Davis stole drugs from James, prompting James's retribution, the testimony of Robert Jones and Avery Haigler at sentencing provides no such connection. At most, Jones and Haigler indicated that at the time of Davis's murder, James was involved in the drug trade. Neither witness, however, indicated Davis successfully stole drugs from James or that they believed Davis was motivated by James's involvement in the drug trade. In fact, both Jones and Haigler testified that James was infuriated not because of any connection the attempted break-in may have had to drugs, but rather because the attempted break-in occurred at his mother's residence. In short, their testimony, and the overall weight of the evidence, does not connect the attempted robbery and the Davis murder with drug-related activity.

Furthermore, there was no evidence Davis was ever a part of the drug conspiracy in this case, or that James ever sold drugs to, or purchased them from, Davis.[3] Even if the

---

[3] In the original indictment, and the first and second superseding indictments, the grand jury found, and the indictments charged, that the drug conspiracy in this case began at least as early as May 2007. The Davis murder occurred in July 2004. If the relevant conduct offense had occurred far beyond the temporal scope of the underlying offense, this would have further indicated that the murder was not related to the drug conspiracy. The parties acknowledged at oral argument, however, that the third superseding indictment charged that the
(Continued)

27

murder happened to be "drug-related" in some sense, nothing connects the Davis murder to the particular drug conspiracy in this case.

James was never charged with Davis's murder nor had he otherwise ever been implicated in the murder up until the present case. We cannot simply assume every act committed by a convicted criminal, no matter how heinous, is connected and relevant to the offense of conviction. To do so would turn the relevant conduct analysis into an impermissible conduit for punishing uncharged and unproven conduct and would circumvent the criminal process.

Second, § 1B1.3(a)(2) is also inapplicable to the present case. As we recently held in Horton, in order for § 1B1.3(a)(2) to apply, both the offense of conviction and the relevant conduct offense must be capable of grouping. Horton, 693 F.3d at 479. Because homicide offenses are explicitly excluded from grouping, § 1B1.3(a)(2) cannot apply. See id. at 477 (noting that § 1B1.3(a)(2) relies on § 3D1.2(d), which in

_____

conspiracy began, not in 2007, but in 2001. Therefore, we do not rely on the timing of the murder and the conspiracy in reaching our conclusion that the government failed to show the two events were sufficiently related to qualify as relevant conduct.

turn excludes Chapter Two, Part A offenses (except § 2A3.5), which include the guideline for murder).

We therefore conclude that the district court committed procedural error in finding the Davis murder to be relevant conduct to the underlying conspiracy in this case, and thus increasing James's base offense level under the cross-reference provision.

B.

Proportionality of Life Sentences

With respect to Appellant James, because we find significant procedural error in the calculation of his sentence, we do not reach the underlying substantive reasonableness of his sentence. See Horton, 693 F.3d at 472. Finding no error with respect to Appellant Sellers, however, nothing prevents us from considering the proportionality of Sellers's life sentence.

As noted, in reviewing the proportionality of a life sentence, this circuit applies the three-part test found in Solem. 463 U.S. at 292. We examine "(1) the gravity of the offense and the harshness of the penalty, (2) the sentences imposed on other criminals in the same jurisdiction, and (3) the sentences imposed for commission of the same crime in other jurisdictions." United States v. Kratsas, 45 F.3d 63, 66 (4th Cir. 1995) (citing Solem, 463 U.S. at 292).

29

In this case, the district court correctly applied the Solem test and determined Sellers's statutorily required life sentence was not constitutionally disproportionate in violation of the Eighth Amendment. Under the first prong of the Solem test, Sellers's offenses were considerably serious. Sellers was determined by the district court to be part of a conspiracy to distribute five kilograms or more of cocaine. This circuit has recognized that smaller amounts of drugs in a conspiracy can be equally serious. United States v. Kellam, 403 F. App'x 815, 817 (4th Cir. 2010) (finding the gravity of 500 grams to 1.5 kilograms of drugs included in a conspiracy to be sufficiently serious to satisfy the first Solem prong). Sellers also possessed a significant criminal history related to drug convictions. This circuit has repeatedly found that life sentences for similar major drug conspiracies for defendants with a history of drug convictions are not disproportionate to similar sentences under the Sentencing Guidelines and sentences imposed by states within this circuit. See Id. at 817 (citing United States v. D'Anjou, 16 F.3d 604, 613–14 (4th Cir. 1994)).

Accordingly, Sellers's life sentence is not constitutionally disproportionate to constitute an Eighth Amendment violation.

IV.

For the aforementioned reasons, we affirm the convictions of James, Sellers, and Matthews. We also affirm Sellers's sentence. We vacate James's sentence and remand to the district court for resentencing.[4]

AFFIRMED IN PART,
VACATED IN PART,
AND REMANDED

---

[4] We have examined all remaining issues raised by the Appellants in their brief and find them to be without merit.

SHEDD, Circuit Judge, concurring in part and dissenting in part:

Although I concur in almost all of the majority's opinion, I respectfully dissent from its conclusion that the district court erred in applying the murder cross-reference when determining Sigmund James's sentence.

I agree with the majority that the framework of United States v. Horton, 693 F.3d 463 (4th Cir. 2012), governs our analysis and that we review the district court's factual findings for clear error and its legal determinations de novo, id. at 474. I further agree with the majority that the district court did not clearly err in finding that James murdered Vance Davis.[1]

I disagree with the majority, however, on whether the murder cross-reference can be applied based on Davis's murder. The evidence in the record provides a sufficient connection between Davis's murder and the drug conspiracy for the murder to

---

[1] The evidence established that James lured Davis to join him by telling Davis that he (James) wanted Davis's help with something. J.A. 1018–19. James and Davis drove off together, and soon after that James told Davis to pull over. J.A. 1019. James then shot Davis five times: once in the head, once in the back, once in the chest, and twice through Davis's right arm and into his chest, J.A. 993–94. Any one of these shots could have been fatal. J.A. 992–94. James left Davis's bullet-riddled body lying on a prominent road in Orangeburg on which a large public high school is located. J.A. 975.

be considered relevant conduct under United States Sentencing Guideline § 1B1.3(a)(1)(A).

First, it is important to clarify exactly what the record was that the district court was permitted to use in sentencing James and that we can consider here. The majority seems to believe that the district court could not consider the Presentence Report's ("PSR") evidence about why James killed Davis. See ante at 27. Such a position is incorrect.

At sentencing, James at first objected to the entire PSR, and when prompted for more specific objections, he objected to all of paragraphs 62, 63, 64, 65, and 66 of the PSR, which described how and why James killed Vance Davis. J.A. 959, 1189–91. What followed this objection leaves no doubt that James objected to the fact that he killed Davis, not why he killed Davis.

After the objection, the district court took testimony from four witnesses—Orangeburg police Captain Ronda Bamberg, Robert Jones, Avery Haigler, and James—regarding Davis's murder. J.A. 972–1089. The testimony of the witnesses and arguments of counsel at the sentencing hearing focused only on whether James killed Davis, not whether that killing was relevant to the drug

33

conspiracy.[2]  See J.A. 972–1093.  After having heard and considered all of this evidence, the district court overruled James's objections to these paragraphs, making an explicit finding of fact that James killed Davis.  J.A. 1101; see United States v. Morgan, 942 F.2d 243, 245 (4th Cir. 1991) (holding that a district court may comply with Federal Rule of Criminal Procedure 32(c)(3)(D) either by separately reciting its findings or expressly adopting the recommendations of the PSR). Confirming that James objected only to the question of whether he committed the murder, after the district court made this finding, James's counsel stated "None, your Honor, no," when asked if he had any further objections.  J.A. 1101.  Based on the testimony, arguments, and even James's allocution,[3] James's objection to these paragraphs in the PSR was based on the fact that he allegedly did not kill Davis, not why he killed Davis. James could have argued that, even if he did kill Davis, he did so for a reason unrelated to the drug conspiracy, but James never made that argument.

---

[2] In these pages of the transcript, James took the stand and emphatically denied killing James.  J.A. 1059.  All of James's testimony focused on whether he killed James, not any motivation for the killing.  See J.A. 1059–89.

[3] When allocuting, James again denied the murder, without ever arguing that the murder was unrelated to the drug conspiracy.  J.A. 1106.

34

Because the district court addressed James's specific objection, it did not need to make an explicit finding about the murder's relevance to the drug conspiracy. On this point, the district court was entitled to rely on the PSR's evidence about why James killed Davis. Having overruled James's objection to the _fact_ of the killing, the district court could, as it did,[4] adopt and rely upon the other facts in the PSR, including from the paragraphs to which James had objected on another basis, to use in sentencing James. J.A. 1101–03.

Having clarified what evidence is in the record and can be considered when determining James's sentence, the next issue is whether that evidence sufficiently connects Davis's murder with the drug conspiracy. The answer is unequivocally yes.

Most obviously connecting the murder with the drug conspiracy are two statements from the PSR. First, paragraph 63 states that Lenell Walker told special agents from the Drug Enforcement Agency that James told him (Walker) that he (James) killed Davis because Davis had stolen drugs from him (James). J.A. 1190. Second, paragraph 64 states that James told Jones

---

[4] Although the district court perhaps could have more explicitly stated that it was adopting the other facts in the PSR, that the district court adopted those facts is obvious. See J.A. 1101–03. Without having done so, the district court would have had no basis for determining the applicable statutory provisions, which the district court based on the PSR.

that Davis had broken into his (James's) home and stolen cocaine, prompting Jones to tell James to resolve the problem or Jones would not provide James any more cocaine. J.A. 1190–91. These two pieces of evidence leave no doubt that the district court could have found that James shot Davis in relation to the drug conspiracy.

No other evidence in the PSR or from the sentencing hearing contradicts these statements about why James killed Davis such that the district court could not have found that James's motivation for killing Davis was drug-related. The other evidence shows the following: James killed Davis after Davis had attempted to break into and rob James's mother's trailer, J.A. 1010; James was living in his mother's trailer at that time, J.A. 1010; James had engaged in drug transactions at that trailer, J.A. 1043; and James was deeply engaged in a drug conspiracy at this time, ante at 27–28 n.3. None of this is inconsistent with the two statements from the PSR about why James killed Davis.[5]

Although the majority focuses on the "inconsistent" testimony about whether Davis attempted to rob James because of

---

[5] Nothing is necessarily inconsistent about the fact that James described an attempted robbery by Davis and a robbery by Davis. James may have been discussing two separate incidents, or he may have varied the story depending on his audience.

36

his drug-related activities or simply attempted to rob James's mother, ante at 26, the majority's analysis belies its claim of any inconsistency. In fact, the majority's analysis indicates that it believes that the testimony clearly supports the conclusion that James killed Davis out of anger that Davis tried to rob James's mother. See ante at 27. Yet the testimony is not nearly so clear. James was undoubtedly upset about the attempted robbery, but neither Jones nor Haigler testified at the hearing about specifically why James was upset. Their statements about the trailer belonging to James's mother are more descriptive of where the attempted robbery took place than of why James was upset. See J.A. 1010-12, 1039-42. Their testimony is certainly, at the very least, not dispositive that the motive for the killing was that Davis tried to rob James's mother. Furthermore, to the extent that this evidence is inconsistent with the PSR, the district court could choose to rely on the evidence from the PSR about the motive for the killing rather than the testimony at the sentencing hearing. This testimony therefore provides little support for the majority's conclusion.

Taken together, the evidence overwhelmingly supports the conclusion that the murder was relevant to the drug conspiracy. To conclude that James killed Davis in connection with the drug conspiracy—whether because James believed Davis stole drugs from

37

him or because James needed to "send a message" that he would not tolerate such threats against him—is not difficult. In reality, it is the most logical conclusion when considering the evidence in the record and taking into account what common knowledge tells us about the connection between drug dealers and gun violence. See United States v. Mitten, 592 F.3d 767, 777–78 (7th Cir. 2010) (recognizing that "[d]rug traffickers will commonly possess firearms to protect their product, to protect their drugs, to protect their cash, to protect their life and even to protect their turf" (alteration in original)); cf. United States v. Grogins, 163 F.3d 795, 799 (4th Cir. 1998) (noting that "the background fact that the connection between illegal drug operations and guns in our society is a tight one").

This conclusion thus does not "turn the relevant conduct analysis into an impermissible conduit for punishing uncharged and unproven conduct," as the majority fears. Ante at 28. Instead, this conclusion ensures that James receives the most just punishment that reflects all of his actions relating to his crimes of conviction. Therefore, I believe the district court did not err by finding that the murder was relevant to the drug conspiracy and thus properly applied the murder cross-reference, and I respectfully dissent from the majority's contrary conclusion.